50 CCPA

**August GUYER, Pascal Matile, Ernst Peterhans and Werner Zollinger, Appellants,**

v.

**Charles Robert CRAMER, Hans-Peter Meyer and Walter Feist, Appellees.**

**Patent Appeal No. 6977.**

United States Court of Customs and Patent Appeals.

June 20, 1963.

William D. Denson, Morgan, Finnegan, Durham & Pine, New York City (Louis E. Marn, Hobart N. Durham and John C. Vassil, New York City, of counsel), for appellants.

Martin J. Brown, Washington, D. C. (John Boustead, New York City, of counsel), for appellees.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

RICH, Judge.

This appeal is from the decision of the Board of Patent Interferences of the United States Patent Office awarding priority of the subject matter of the single count of Interference No. 90,053 to the senior party Charles Robert Cramer et al.[1]

August Guyer et al. are involved in the interference on their application Serial No. 622,733, filed November 19, 1956, for "Process for the Pressure Synthesis of Urea," claiming a convention priority date based on their Swiss application dated April 16, 1956.

Cramer et al. are involved in the interference on (1) their continuation-in-part application Serial No. 659,499, filed May 16, 1957, for "Process for Preparing Pure Urea," and (2) their parent application Serial No. 506,092, filed May 4, 1955, claiming a convention priority date based on their Swiss application dated May 17, 1954.

The single simple issue is whether Cramer et al. are entitled to the U. S. filing date of their parent application, Serial No. 506,092, as a constructive

---

[1]. Cramer et al. were made senior party when the Primary Examiner granted their motion to shift the burden of proof based on their May 4, 1955, filing date of application Serial No. 506,092, discussed infra.

reduction to practice of the invention of the count. It is not necessary to consider either party's Swiss application because, if Guyer et al. are entitled to the May 4, 1955, parent United States filing date, their priority is established, as the board held.

The invention relates to a process of synthesizing pure urea which will not lead to the corrosion of the vessels in which it is undertaken and consequent contamination of the urea. Appellee's application Serial No. 659,499 states (all emphasis ours):

"It is a known fact that in the synthesis of urea from carbon dioxide and ammonia the use of high temperatures of about 153° C, and above, leads to prohibitive corrosion of the vessels in which the ammonium carbamate is formed (see Frejacques 'Chimie et Industrie' 60, 2211 (1948).). In our own operations, we have found that at operating temperatures of 160–190° C. urea produced in ordinary steel vessels becomes red colored *by the iron oxide formed due to corrosion.* The useful life of the apparatus is thereby considerably decreased, and this is, of course, a great disadvantage to the economy of the process.

"Another drawback consists in the difficulty of removing the iron which contaminates the urea. * * *

*     *     *     *     *     *

"According to the invention of our copending application, Ser. No. 506,092, it has been found that corrosion can be considerably suppressed in the preparation of urea from ammonia and oxygen-free carbon dioxide at elevated temperature and increased pressure in rust-proof apparatus, when oxygen is added *to the gases used at the start.*

*     *     *     *     *     *

"Generally stated, the present invention comprises the steps of first eliminating the sulfur contained in $CO_2$ to be used in the synthesis of urea, to an amount below 1 ppm.,

then adding oxygen in an amount ranging between 0.01 and 0.05% by volume *based on the amount of $CO_2$ present,* and thereafter reacting the gas thus prepared with gaseous $NH_3$ at elevated temperature between 160 and 190° C., and under increased pressure in the range of 150–200 atm."

The count, which was drawn by the Primary Examiner and suggested to the parties, reads:

"In the synthesis of pure urea by the reaction of carbon dioxide and a stoichiometric excess of ammonia at elevated pressures and temperatures in apparatus having stainless steel surfaces exposed to the reaction medium, the step of decreasing the corrosive effect of said medium and the turbidity of the product urea by introducing oxygen gas into said reaction with said reactants *in an amount equal to 0.01% to 0.05% by volume on the amount of carbon dioxide introduced."* [Emphasis ours.]

The issue presented by this appeal may now be more particularly stated to be whether the parent application, Serial No. 506,092, of Cramer et al. discloses *the basis for determining the amount of oxygen to be used* which is required by the count and explicitly set forth by Cramer et al.'s later application Serial No. 659,499. That basis is that the amount of oxygen used be "equal to 0.01% to 0.05% *by volume on the amount of carbon dioxide* introduced." [Emphasis ours.]

The Primary Examiner, and the board in affirming his decision on motions, held that the above count was supported by the disclosure of application Serial No. 506,092. We do not agree.

The board in its opinion admitted that.

"It is true that the exact language of the last two lines of the count is not found in the Cramer et al. earlier case [application Serial No. 506,-092], namely, 'by volume *on the amount* of carbon dioxide introduced.'"

The board also pointed to certain portions of the parent application disclosure which

" * * * do not describe the addition of the oxygen or oxygen-containing gas to carbon dioxide. The first two disclosures definitely describe the addition of oxygen to a mixture of ammonia and carbon dioxide, the 'starting gas.' The third disclosure is susceptible to the same interpretation, but it may be also interpreted to mean that each of the gases is separately introduced."

The portions of this disclosure, in parent application Serial No. 506,092, which we feel are particularly pertinent are the following (the emphasis being ours):

"When carbon dioxide is used, which was obtained in the ammonia synthesis gas preparation and which, as a rule is *free* of oxygen, we have found that the urea resulting from the synthesis is of brown color, due to its iron content. * * *

* * * * * *

"If, under the same conditions, in addition to *carbon dioxide and ammonia in the starting gas*, oxygen is used in an amount of about 0.05 to 1.0% by volume, either in a pure state or in the form of an oxygen-containing gas mixture, urea will be obtained having an iron content below 0.004% by weight which can be purified with the conventional filtering agents to such an extent that the iron content will drop below 0.0002% by weight.

"*The urea is a pure white color* and can be used without further treatment as starting material for synthetics, such as plastic and textile adjuvants, as well as for feeding purposes."

This disclosure clearly does *not* support the count limitation; on the contrary it seems to indicate that the percent by volume is based on "the starting gas," which includes both $CO_2$ and $NH_3$.

The stated theory according to which the addition of oxygen prevents the cor-

rosion is that corrosion is caused by tne presence of a small amount of hydrogen and that a sufficient amount of oxygen is added to react with the hydrogen and eliminate it from the mixture. The parent application states:

"It has now been found that corrosion can be considerably suppressed in the preparation of urea from ammonia and oxygen-free carbon dioxide at raised temperature and increased pressure in stainless steel apparatus, when oxygen is added *to the gases used* at the start."

The impression left by this statement certainly does not tend to negative calculation of volume of oxygen on "the starting gas."

The board in effect disregarded the above-noted passages quoted from the specification and concentrated on the disclosure of Example 2, which reads as follows (our emphasis):

"The operating conditions are the same as described in Example 1 [in which no oxygen was added] with the difference that *to the carbon dioxide used is added 0.05 to 0.2% by volume of $O_2$ in the form of air, or as pure oxygen*. The melt then obtained is of pure white color, or at the utmost slightly yellow, having an iron content below 0.004% by weight. This iron content is considerably lower than when carbon dioxide *free* of oxygen is used and can be removed by conventional filtering agents to such an extent that the crystallized urea has an iron content of less than 0.0002% by weight, so that it can be used without further processing in the plastics and textile adjuvants manufacture."

The board found the emphasized portion of the above example entirely unequivocal and to support the count limitation. We do not. The equivocal nature of this example may be seen from the fact that while the entity *to which the oxygen is added,* carbon dioxide, is clearly identified, there is no identification whatsoever of the basis of reference for the "by

volume" requirement. According to this example, the volumetric basis for oxygen addition to carbon dioxide could be either the volume of $CO_2$ or the volume of $CO_2$ plus $NH_3$ in the starting gas.

We feel that this application's disclosure is so worded as to have *no* "necessary and only reasonable" construction which would provide support for the "on the amount of carbon dioxide introduced" limitation of the count. See Binstead et al. v. Littmann et al., 44 CCPA 839, 242 F.2d 766.

In addition to the above reason, however, we note that in *both* Example 2 and that portion of the disclosure of the parent application quoted above which explicitly talks about adding oxygen "in an amount of about 0.05 to 1.0% by volume" to the "carbon dioxide *and* ammonia in the *starting gas*" (our emphasis), the amount of iron content found is stated in the same terms ("below 0.004% by weight"), the extent to which this content can drop on filtration is the same ("below 0.0002% by weight") and the color of the urea is the same ("pure white"). These considerations lead us to conclude that if any interpretation of the equivocal words "by volume" in Example 2 were attempted, this interpretation would lead one to believe that the "volume" intended would be in fact that of the carbon dioxide *and* the ammonia, "the starting gas." In any event, the minimum legal requirement is that the support for count limitations be clear, and that it certainly is not.

The board also supported its conclusion by reference to original claims 6 and 8 of parent application Serial No. 506,092 which read:

"6. A process for preparing pure urea from ammonia and carbon di-

oxide at increased pressure and elevated temperature in stainless steel apparatus, which comprises using in the reaction $CO_2$ withdrawn from a previous synthesis operation and adding oxygen in the gas returned to the apparatus for further reaction.

"8. A process according to claim 6, which comprises adding oxygen in the concentration of 0.05 to 0.2% by volume."

With respect to these claims the board said:

"They expressly recite the addition of oxygen to carbon dioxide *prior to* its reaction with ammonia. Dependent claim 6 [sic, meaning 8] further *explicitly recites* the concentration of the oxygen addition in volume per cent." [Emphasis ours.]

It can be seen, however, that the "by volume" expression in claim 8 is no more definite as to its basis of calculation than is the identical expression appearing in Example 2.

In view of the above conclusion that the volume limitation of the count lacks support in the parent application, we find it unnecessary to discuss the subsidiary questions urged by appellant including: (1) the sufficiency of the 0.05% oxygen disclosure in application Serial No. 506,-092 to support the "0.01% to 0.05%" range of the count; (2) appellants' contention that in this application the oxygen concentration must be based, if not on carbon dioxide and ammonia, then nevertheless on carbon dioxide with gases other than ammonia; and (3) the effect of inconsistent statements made by counsel for Cramer et al. during prosecution.

The decision of the board is reversed.
Reversed.