**HARRINGTON MANUFACTURING CO., INC., Plaintiff-Appellant-Cross Appellee,**

v.

**Idas B. WHITE, Defendant-Appellee-Cross Appellant.**

**No. 71-2032.**

United States Court of Appeals, Fifth Circuit.

March 13, 1973.

Rehearing and Rehearing En Banc Denied June 7, 1973.

Fred C. Philpitt, Washington, D. C., Robert D. Canada, Tallahassee, Fla., Elliott I. Pollock, Washington, D. C., for appellant.

Marion B. Knight, Blountstown, Fla., Harvey B. Jacobson, Jr., Washington, D. C., for appellee.

Before JOHN R. BROWN, Chief Judge, and GOLDBERG and MORGAN, Circuit Judges.

JOHN R. BROWN, Chief Judge:

On June 27, 1967, the United States Patent Office issued Patent No. 3,327,745, to Fred W. Meece and Frank B. Dew, both of Plymouth, North Carolina. The patent covered a hydraulically powered "tree cutter device". On October 2, 1968, this lawsuit was filed by Meece and Dew's assignee, the Harrington Manufacturing Company, seeking damages and appropriate injunctive relief from Idas B. White for the latter's alleged infringement of the Meece-Dew patent. In addition to denying infringement, White asserted the invalidity of the Meece-Dew patent as a positive defense. Upon the conclusion of the nonjury trial, the District Judge entered a memorandum order and opinion 323 F. Supp. 1345, upholding the validity of the Meece-Dew patent, but finding no infringement. Both parties appeal.

 Our review of the case convinces us that the Court below properly upheld the validity of the Meece-Dew patent. Upon a close examination of his holding with respect to infringement, however, we are compelled to reverse. It all boils down to the question of how to construe three little words in the patent claims—"flexible interconnection means". The trial court applied a common meaning, common sense construction and held that the patent, by expressly contemplating the use of a *"flexible* interconnection means", did not envision—and hence would not protect—the use of an interconnection means, like a double acting hydraulic cylinder, which could be locked rigidly in place. But this ignores the basic purpose, the prosecution history, and—most importantly—the actual wording of the claims.[1] Giving appropriate considera-

1. Since the claims of a patent establish, as would a deed an estate in land, the metes and bounds of the grant, Motion Picture Patents Co. v. Universal Film Manufacturing Co., 1917, 243 U.S. 502, 510, 37 S.Ct. 416, 418, 61 L.Ed. 871, 876, we set them out in full for all to read who will:

 1. An improved tree cutting device including:
 (a) a cutting blade.
 (b) one end of said cutting blade being pivotably mounted with respect to a pair of fixed jaw members.
 (c) fluid operated cylinder and piston means interconnecting said pair of jaw members and said cutting blade,
 (d) two generally parallel supporting arms having their rear ends adapted to be pivotably attached to a vehicle,
 (e) pivot means for pivotally interconnecting said two generally parallel supporting arms and said pair of fixed jaw members, so that said pair of fixed jaws can have limited pivotal movement about a horizontal axis,
 (f) flexible interconnection means interconnected between said two generally parallel supporting arms and said pair of fixed jaw members which serves to limit the pivotal arc through which the fixed jaw members can pivot.

 2. An improved tree cutting device including:
 (a) a cutting blade.
 (b) one end of said cutting blade being pivotably mounted with respect to a pair of fixed jaw members,
 (c) fluid operated cylinder and piston means interconnecting said pair of jaw members and said cutting blade,
 (d) said fixed jaw members being mounted for vertical pivotal movement about an elongated horizontally disposed beam, and said fixed jaw members being additionally connected to said elongated horizontally disposed beam by flexible interconnection means so that said fixed jaw members are free to move through a limited pivotal arc.
 (e) two generally parallel supporting arms having their front ends attached to said beam and having their rear ends adapted to be pivotably attached to a vehicle, and
 (f) means for raising and lowering said beam.

tion to these factors, we are convinced that these three little words sufficiently described the inventive concept of the patent, and in turn, that that concept is invaded by Defendant's device. The reading which we give to these three little words thus both sustains the trial court's holding of validity and requires us to reverse his holding of non-infringement.

## I. Woodman, Don't Spare That Tree!

Modern civilization requires vast quantities of lumber and pulpwood for its progress. Originally man satisfied his need for timber by hacking down trees with crudely fashioned hand tools. As his need and sloth increased man invented the saw to cut through the wood more rapidly and efficiently. Even this innovation did not satiate society's appetite, however, and about twenty-five years ago man began using small gasoline powered chain saws. But even these paragons of technological advance had their problems—among them the fact that tired aching backs refused to wield them at ground level. Thus, by cutting the trees higher than ground level lumberjacks left a considerable amount of wood unused. These uncut stumps also marred the beauty of the landscape and impeded the progress of log removal from the forest.

### Meece and Dew

In 1965 Meece and Dew bent their creative ingenuity towards rectifying these problems. They started by constructing the cutting device. It consisted of a fixed jaw, which would press against the backside of the tree, a blade to do the actual cutting, and a pair of hydraulic cylinders to close the blade. They called the whole assembly a "shear head". (See Figures A and B depicting the shear head in both the open and closed positions.)

**FIG. A.**

**FIG. B.**

Meece and Dew then designed a "C" frame to be used to attach the shear

3. An improved tree cutting device according to claim 2, wherein said flexible interconnection means comprises a cable.

4. An improved tree cutting device according to claim 2, wherein said flexible interconnection means comprises a chain.

5. A tree cutting device according to claim 2, wherein said means for raising and lowering said beam comprises a hydraulic cylinder and piston.

6. A tree cutting device according to claim 2, wherein said jaw members are provided with a plurality of teeth.

7. An improved tree cutting device according to claim 2, wherein said flexible interconnection means includes an upstanding post on said beam, a connec-tion means on the top of said jaws, and a flexible element interconnecting said upstanding post and said connection means.

8. An improved tree cutting device according to claim 7, wherein said flexible element comprises a chain.

9. An improved tree cutting device according to claim 7, wherein said flexible element comprises a cable.

10. A tree cutting device according to claim 1, wherein said flexible interconnection means comprises an adjustable hydraulic cylinder.

Plaintiff alleges that defendant White's shear infringes Claims 1, 2, 5, 7 and 10. He specifically points to the very precise wording of Claim 10 in terms of a hydraulic cylinder.

head to the tractor. It consisted principally of two parallel arms which were to be mounted to the sides of the tractor with movable joints. Across the front of these arms they welded a support beam. This beam was horizontal with the ground. In order to be able to elevate the entire shear head another hydraulic cylinder was mounted onto the front of the tractor and attached to the support beam.

The inventors then attached the shear head assembly to the support beam of the "C" assembly by means of several pivotal connections. This would allow the angle of the shear head to be adjusted according to the plane of the ground. This angular adjustment of the shear head was the "basic concept" of the Meece-Dew invention. It was the innovation calculated to solve the problems of stumpage which Meece and Dew had in mind. It was the Meece-Dew shear's "raison d'être".

Only one thing remained. Meece and Dew needed some element which would stabilize the shear head in the angle of the plane of the ground. They conceived of several possible means to accomplish this end. But when they built their first model, Meece and Dew chose the means which appeared to be the most rugged, the easiest to put in place, the easiest to repair, and the least expensive, i. e. they used a chain, which was attached at one end to the shear head and at the other to a supporting post welded perpendicular to the beam. (See Figure C.) [2] In describing the various elements which could perform this task the patentees subsequently applied the fated nomenclature "flexible interconnection means".

FIG. C.

Meece and Dew demonstrated their tree shear to several interested parties in December 1965. By February 1966, the Plaintiff Harrington Manufacturing Company had acquired exclusive rights to the invention in exchange for an agreement to prosecute the patent application in Meece and Dew's behalf and make continuing royalty payments to them. By May 1966, Harrington was manufacturing the Meece-Dew shear and distributing it to its customers.

### White

Meanwhile (that is in May, 1966) in Blountstown, Florida, the defendant Idas B. White was contacted by several unnamed individuals who requested that he build hydraulically operated tree shears for them. The resultant shear was field tested by White on July 30, 1966. The White shear was substantially identical to the Meece-Dew design, including the adjustable cutting head. Significantly, on first testing his shear White used a chain linkage support element. On finding this unsatisfactory he resorted to hydraulic cylinders.

### Harrington-White Interaction

As assignee of the Meece-Dew patent rights Harrington was more than normally curious when he heard that

---

2. None of the hydraulic cylinders shown in this figure were the subject of this controversy. The White shear used a double acting hydraulic cylinder in place of the chain and post shown at point 1 in Figure C.

someone in Blountstown, Florida, was building a tree shear similar to the Meece-Dew model which his company was then marketing. In August 1966, Joseph J. Harrington, Plaintiff's president, stopped to meet with White en route to Panama City, Florida, where the Harrington version of the Meece-Dew shear had been displayed since June 1966. The trial court found that Harrington made a suggestion that White might manufacture hydraulic cylinders for use on the Meece-Dew shear head (see Figures A and B, *supra*), that both parties voiced their intentions to seek patents, that Harrington had the opportunity to observe a photograph of the White shear, and ultimately that Harrington offered to purchase White's patent rights.[3] Negotiations stalled and this suit followed. As first patentee of this design, Harrington has the paramount right to manufacture the Meece-Dew shear. Southern Implement Manufacturing Co. v. McLemore, 5 Cir., 1965, 350 F.2d 244, 248. Unless White can prove that the Meece-Dew patent was invalid, Harrington is entitled to relief if he proves that White's shear infringed the patent.

## II. Up A Tree: Validity

■ Patents are a favored exception to the antitrust policies of the United States. While many patent advocates argue passionately that since they promote disclosure to society rather than exclusion from society that the term "monopoly" should not be applied patents, the better-reasoned view is that they are monopolies in the sense that they are governmentally protected rights to exclude others from the manufacture or sale of the patented article. Although the seventeen year duration is a built-in safeguard against extended abuse of the patent concession, society demands additional restrictions. One such restriction is the availability of ju-

dicial review of the patent. Thus, the Supreme Court of the United States has held:

There has been a tendency among the lower federal courts in infringement suits to dispose of them where possible on the ground of noninfringement without going into the question of validity of the patent. It has come to be recognized, however, that of the two questions, validity has the greater public importance, and the District Court in this case followed what will usually be the better practice by inquiring fully into the validity of this patent.

Sinclair & Carroll Co. v. Interchemical Corp., 1944, 325 U.S. 327, 330, 65 S.Ct. 1143, 1145, 89 L.Ed. 1644, 1646 (citations omitted). See also Beckman Instruments, Inc. v. Chemtronics, Inc., 5 Cir., 1970, 428 F.2d 555, 557; Sterner Lighting Inc. v. Allied Electrical Supply, Inc., 5 Cir., 1970, 431 F.2d 539. Finding the Meece-Dew tree shear patent to be one involving deep public interest, we carefully review the trial court's decision upholding the validity of the patent.

■ We start from the proposition that a lawfully issued patent is presumed to be valid. 35 U.S.C.A. § 282; Railex Corp. v. Speed Check Co., 5 Cir., 1972, 457 F.2d 1040, 1043; Beckman Instruments, *supra* at 560 or 428 F.2d; Foster Cathead Co. v. Hasha, 5 Cir., 1967, 382 F.2d 761, 764. Thus, the "burden of establishing invalidity of a patent shall rest on a party asserting it." 35 U.S.C.A. § 282.

The presumption of patent validity is rebuttable. 35 U.S.C. § 282; Radio Corp. of America v. Radio Engineering Laboratories, 1934, 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163. The courts, however, have not distinguished themselves for consistency in their determination of the quantum of proof necessary to rebut the presumption. For instance, this Court has employed

---

3. On July 10, 1967, the Patent Office issued Patent No. 3,382,899 to Idas B. White covering his shear. Neither the validity nor the construction of that patent is at issue in this litigation.

794

varying statements of the necessary quantum of proof. *See, e. g.*, Kardulas v. Florida Machine Products Co., 5 Cir. 1971, 438 F.2d 1118 ("clear and convincing * * * a mere preponderance of the evidence is insufficient * * * beyond a reasonable doubt"); V & S Ice Machine Co. v. Eastex Poultry Co., 5 Cir. 1971, 437 F.2d 422 ("competent evidence"); Stamicarbon, N. V. v. Escambia Chemical Corp., 5 Cir. 1970, 430 F.2d 920 (reviewing all the standards and approving the use of the beyond-a-reasonable-doubt standard); Kiva Corp. v. Baker Oil Tools, 5 Cir. 1969, 412 F.2d 546 ("beyond a reasonable doubt * * * clear and convincing"); Metal Arts Co. v. Fuller Co., 5 Cir. 1968, 389 F.2d 319 ("clear, satisfactory, and, by some it is said beyond a reasonable doubt"); Zero Mfg. Co. v. Mississippi Milk Producers Assoc., 5 Cir. 1966, 358 F.2d 853 ("strong rebuttal"); Southern Implement Mfg. Co. v. McLemore, 5 Cir. 1965, 350 F.2d 244 ("beyond a reasonable doubt"); Samuelson v. Bethlehem Steel Co., 5 Cir. 1963, 323 F.2d 944 ("Any reasonable doubt will be resolved against the party alleging the invalidity of a patent"); Fairchild v. Poe, 5 Cir. 1958, 259 F.2d 329 ("beyond a reasonable doubt"); Zachos v. Sherwin-Williams Co., 5 Cir. 1949, 177 F.2d 762 ("beyond a reasonable doubt"). We do not attempt to resolve this apparent inconsistency. Rather, we state that the presumption of patent validity may be rebutted only by a quantum of proof—whether it be called clear and convincing or beyond a reasonable doubt—which is greater than a mere preponderance of the evidence. One who seeks to rebut the presumption bears a heavy burden. Cf. Radio Corp. of America v. Radio Engineering Laboratories, 1934, 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163.[3] Hobbs v. United States, 5 Cir., 1971, 451 F.2d 849, 856. See *Railex, supra* at 1043–1044 of 457 F.2d.

There are essentially three tests for patentability: utility, novelty, and non-obviousness. 35 U.S.C.A. §§ 101, 102, 103; Beckman, *supra* at 561 of 428 F.2d; Hobbs, *supra* at 855, of 451 F.2d. It is clear that the constitutionally required element "to promote the *useful* arts and sciences" is satisfied by the Meece-Dew invention. Likewise, our review of the case satisfies us that the statutorily articulated requirement[4] of non-obviousness is met. In this regard we note that the Meece-Dew shear solved the plaguing problems of the industry with great commercial success. See Graham v. John Deere Co., 1966, 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545, 556.

The issue of novelty, or phrased in another way—whether the invention was anticipated by the prior art, is quite another thing. Brandishing prior patents, White strenuously contends that the Meece-Dew concept was anticipated by the relevant prior art. Of the six prior patents listed by the Court and parties as being the relevant prior art it is undisputed that four were before the examiner in the Patent Office. White has clearly not introduced a whit of evidence to rebut the presumption of validity with respect to these patents.

4. Section 103 of the Patent Act of 1952 added this criterion. In *John Deere, supra*, the Supreme Court held that it was merely a codification of pre-1952 case law.

The test for obviousness under § 103 is whether the design of the patentee would have been a clear extension of previously existing principles to one possessing ordinary skill in the relevant prior art. See Ingersoll-Rand Co. v. Brunner & Lay, Inc., 5 Cir., 1973, 474 F.2d 491.

The trial judge here specifically found that no prior inventor had conceived the notion of mounting the cutting head of a shear so that it could pivot to parallel the plane of the ground. The Judge also held that the great commercial success which the Meece-Dew shear enjoyed was indicative of its non-obviousness. While not to be given controlling weight, this is certainly a permissible factor. *John Deere, supra; Ingersoll-Rand, supra.*

But, in spite of the District Court's finding of fact to the contrary, White urges that the French Patent No. 1,313,995 and the Burke Patent U.S. No. 638,553, were not before the examiner. Of course the statutory presumption of validity, 35 U.S.C.A. § 282, is diluted when the patent was not issued after a consideration of the prior art. American Seating Co. v. Southeastern Metals Co., 5 Cir., 1969, 412 F.2d 756, 760. Even a cursory examination of these patents, however, dispels the specter of anticipation.

The French Patent consists of a shear head similar to the Meece-Dew design but mounted on a single, elongated, telescopic tubular arm extending from the front of the tractor. It adds nothing to the prior art of record. The ancient 1899 Burke Patent consisted of a steam powered circular saw. Its only potential resemblance to the Meece-Dew design was the presence of a means to limit the downward motion of the cutting head. When one recalls the fact that the major innovation of Meece and Dew was the angular adjustment it becomes apparent that the Burke Patent's connection with the Meece-Dew patent is severely attenuated, if, indeed, it exists at all. In making this argument White is not only far-afield—he is out of the forest.

In a last ditch effort to salvage something from his invalidity argument White contends that even if the independent claims of the Meece-Dew patent are valid, that Claim 10, which specifically names a hydraulic cylinder as an alternative "flexible interconnection means", is invalid because either (i) the drawings in the patent application failed to disclose it, or (ii) White was a prior inventor with respect to this element.

A patent application does not have to graphically depict every conceivable element of the invention as long as it details the essential factors. "A rejection of the claim for lack of showing in the drawing alone is not tenable." Ex parte Taylor, Patent Office Board of Appeals, 1944, 66 U.S.P.Q. 366, 367. 4

Walker on Patents (2d ed. Deller 1965) § 247. Cf. Up-Right, Inc. v. Safway Products, Inc., 5 Cir., 1963, 315 F.2d 23, 27.

Concerning White's argument that he was a prior inventor we only say that a patentee does not have to manufacture the full range of possible equivalents to his patent to satisfy the 35 U.S. C.A. § 102(g) requirement of reasonable diligence to reduce to practice. If his basic ingenuity is fully disclosed and if he takes expedient steps to utilize his concept, a patentee will be allowed the protection of the law to the extent of his full range of equivalents.

### III. Out On A Limb: Infringement

The major premise of the trial court's holding that the White shear did not infringe the Meece-Dew patent, was his conclusion of law that "the word 'flexible' as appears in the Meece patent and as included in the phrase 'flexible interconnection means' should be given its ordinary and accustomed meaning. Accordingly, the Meece patent claims in suit all describe tree shears in which the support linkage is flexible or allow the shear head to freely move. The claims are not broad enough to include tree shears in which the support linkage is substantially rigid."

His minor premise was a finding of fact: "The defendant tree shear employs a double acting hydraulic cylinder as the sole element of the supporting linkage between the shear head and mounting assembly. The testimony of the qualified expert witnesses establishes by a preponderance of the evidence that the double acting hydraulic cylinder and circuit as used in the White tree shear is a rigid and not a flexible interconnection."

Thus, from these two premises his obvious conclusion was "the double acting hydraulic cylinder in the White shear structure is not equivalent to the 'flexible interconnection means' of the Meece patented tree shear and, therefore, there can be no infringement.".

A patent is infringed only if there is substantial identity between the accused device and the patented invention as to means, operation, and result. Stewart-Warner Corp. v. Lone Star Gas Co., 5 Cir., 1952, 195 F.2d 645, 648; Beckman Instruments, Inc. v. Chemtronics, Inc., 5 Cir., 1970, 428 F.2d 555, 563; Sterner Lighting, Inc. v. Allied Electrical Supply, Inc., 5 Cir., 1970, 431 F.2d 539, 543; U. S. Industries v. Otis Engineering Corp., 5 Cir., 1958, 254 F.2d 198; McCutchen v. Singer Co., 5 Cir., 1967, 386 F.2d 82. Normally this poses a question of fact to be resolved by a jury or Judge sitting as fact-finder under F.R.Civ.P. 52(a), Hughes Tool Co. v. Varel Manufacturing Co., 5 Cir., 1964, 336 F.2d 61; *Walker, supra* at § 511.

In the present case, our review of the case convinces us that the trial Judge misconstrued the claims of the Meece-Dew patent in formulating his major premise. Thus, we reverse without contesting the correctness of his findings of fact. See *Sterner Lighting, supra* at 543 of 431 F.2d.

It is axiomatic patent law that improvement patents in a crowded art are to be construed narrowly. Since the frequently-asserted "anticipation" ground of invalidity calls for a factual determination, Inglett & Co. v. Everglades Fertilizer Co., 5 Cir., 1958, 255 F.2d 342, 345; *Sterner Lighting, supra* at 541 of 431 F.2d, the patentee's narrow contentions in the validity context often dovetail unwelcomed into his broad contentions with respect to infringement. But a "patent may not, like a 'nose of wax', be twisted one way to avoid anticipation and another to find infringement." *Sterner Lighting, supra* at 544, citing White v. Dunbar, 1886, 119 U.S. 47, 51, 7 S.Ct. 72, 74, 30 L.Ed. 303; Permo, Inc. v. Hudson-Ross, Inc., 7 Cir., 1950, 179 F.2d 386.

Concerning the validity of the patent in suit, the District Court assessed the prior art and determined that

Although certain constituent elements of the Meece patent were known in the prior art, the flexible interconnection means of the Meece patent produced a new and useful result and did not anticipate the prior art. It is this act of selection and arrangement of elements which, if it overcomes defects in the prior art, produces the invention and renders it novel.

Distilled to its essence, this statement indicates that the district court held that by designing the cutting jaws to pivot axially with respect to the horizontal support beam, Meece and Dew had made a patentable improvement on the prior art of tree-felling. Curiously, it is at this very point of novelty that the alleged infringement took place. But White seeks to distinguish his model from the Meece-Dew shear in two important respects: (i) the Meece-Dew patent specifically calls for a *flexible* interconnection means while the interconnection means in the White model is rigid, and (ii) the functions performed by the double acting hydraulic cylinder on the White shear were beyond the realm of Meece-Dew inventiveness. We take them up in this order.

### Lexicographic License

The central determinant of the infringement issue is whether the use of a hydraulic cylinder to vary the angle of the cutting blade in the White shear constitutes the requisite identity of means to the Meece-Dew patent. Contending that it does not, White directs our attention to the fact that the Meece-Dew patent calls for a "flexible interconnection means" to accomplish this function. He parrots the syllogistic reasoning which the trial Court articulated in its opinion: (i) According to the very words of the Meece-Dew patent only a means which is "flexible" would be an infringing copy; (ii) Once the position of a hydraulic cylinder is set it is rigid; and (iii) Therefore, the hydraulic cylinder cannot possibly be an infringing means.

Harrington counters by strongly urging that the term "flexible interconnection means" means what they choose it

to mean, and, accordingly, they are entitled to the mesnes. In support of this argument they cite the handy apothegm that a "patentee may be his own lexicographer and . . . his own grammarian."[5] Inglett & Co., v. Everglades Fertilizer Co., 5 Cir., 1958, 255 F.2d 342, 347. See Thurber Corp. v. Fairchild Motor Corp., 5 Cir., 1959, 269 F.2d 841, 850; Thermo King Corp. v. White's Trucking Service, Inc., 5 Cir., 1961, 292 F.2d 668, 675; Chicago Steel Foundry Co. v. Burnside Steel Foundry Co., 7 Cir., 1943, 132 F.2d 812, 814; Sockman v. Switzer, 1967, 379 F.2d 996, 1002, 54 C.C.P.A. 1563; Barrett v. United States, 1968, 405 F.2d 502, 507, 186 Ct.Cl. 210.[6]

5. The great treatise, in expounding the proper test for infringement, has specifically realized the efficacy of interpreting patent claims in accordance with the purpose and intent of the patentee rather than the common denotations of his choice of words:

> "To allow literality alone to satisfy the infringement test would force patent law to reward literary skill not the inventor's creativity. Since the law is intended to benefit the inventor's genius and not the scrivener's talent, the structures must do the same work in substantially the same way and accomplish substantially the same result . . . ."

7 Walker on Patents (2d ed. Deller 1972) § 531 at 307.

6. The Court of Claims, in first accepting this rule, explained the difficulty which a Court faces when the inventor's chosen terminology does not adequately embrace the totality of his concept. Thus, the Court in a fascinating opinion by Judge Durfee concluded that resort must often be had to factors beyond the plain meaning of the chosen term:

> Courts occasionally have confined themselves to the language of the claims. When claims have been found clear and unambiguous, courts have not gone beyond them to determine their content. Keystone Bridge Co. v. Phoenix Iron Co., supra, 95 U.S. [274,] at 278, 24 L.Ed. 344; Borg-Warner Corp. v. Mall Tool Co., 217 F.2d 850 (7th Cir. 1954); Zonolite Co. and Insulating Concrete Corp. v. United States, 149 F.Supp. 953, 138 Ct.Cl. 114 (1957). Courts have also held that the fact that claims are free from ambiguity is no reason for limiting the material which may be inspected for the purpose of better understanding the meaning of claims. Warner & Swasey Co. v. Universal Marion Corp., supra, 237 F.Supp. [719,] at 737.
>
> We find both approaches to be hypothetical. Claims cannot be clear and unambiguous on their face. A comparison must exist. The lucidity of a claim is determined in light of what ideas it is trying to convey. Only by knowing the idea, can one decide how much shadow encumbers the reality.

The very nature of words would make a clear and unambiguous claim a rare occurrence. Writing on statutory interpretation, Justice Frankfurter commented on the inexactitude of words:

> They are symbols of meaning. But unlike mathematical symbols, the phrasing of a document, especially a complicated enactment, seldom attains more than approximate precision. If individual words are inexact symbols, with shifting variables, their configuration can hardly achieve invariant meaning or assured definiteness.

Frankfurter, Some Reflections on the Reading of Statutes, 47 Col.L.Rev. 527, 528 (1947). See, also, A Re-Evaluation of the Use of Legislative History in the Federal Courts, 52 Col.L.Rev. 125 (1952).

The inability of words to achieve precision is none the less extant with patent claims than it is with statutes. The problem is likely more acute with claims. Statutes by definition are the reduction of ideas to print. Since the ability to verbalize is crucial in statutory enactment, legislators develop a facility with words not equally developed in inventors. An invention exists most importantly as a tangible structure or a series of drawings. A verbal portrayal is usually an afterthought written to satisfy the requirements of patent law. This conversion of machine to words allows for unintended idea gaps which cannot be satisfactorily filled. Often the invention is novel and words do not exist to describe it. The dictionary does not always keep abreast of the inventor. It cannot. Things are not made for the sake of words, but words for things. To overcome this lag, patent law allows the inventor to be his own lexicographer. Chicago Steel Foundry Co. v. Burnside Steel Foundry Co., 132 F.2d 812 (7th Cir. 1943); Stuart Oxygen Co. Ltd. v. Josephian, 162 F.2d 857 (9th Cir. 1947); Universal Oil Products Co. v. Globe Oil & Refining Co., 137 F.2d 3

■ Because there was no extant generic phrase which would encompass all of the possible means to vary the angle of the cutting head, Meece and Dew's patent solicitor employed the phrase "flexible interconnection means". Reading the claims in light of the purpose and function to be served by the "interconnection means" we conclude that the term includes the use of a hydraulic cylinder.

The basic concept of the Meece-Dew patent—indeed, the major innovation which enabled their invention to pass the obviousness and novelty tests of validity—was that the plane of the shear's cutting head could be angularly adjusted. Perhaps the term *adjustable* interconnection means" would have more aptly described the means in terms of the end. But it is not the duty of this Court to rewrite the patent claims for Meece and Dew. Their able counsel, in choosing the term "flexible interconnection means" sought to convey the thought that the means could accomplish the end, i. e., variance of the angle of the cutting head. Viewed in the light of the basic concept of the Meece-Dew invention, the prosecution history, and the specific wording of Claim 10, the term necessarily includes the use of a hydraulic cylinder.

White has made much on this appeal about the fact that the Meece-Dew design required some "give" in the interconnection means to withstand the pressure from the natural reaction when the cut is completed and the tree falls. But a careful reading of the specifications reveals that the only time "give" is used in the patent is where the patentee described that quality which would allow the blade to be angularly adjusted so that it would rest on the ground and transmit most of the shock from the falling tree to the ground. Although the patentee clearly extolled the virtues of "give", it is manifest that "give" or "flexibility" in the sense of a self-adjustment to withstand shock was only an incidental benefit of the design. The basic concept of the Meece-Dew patent was one of adjustability. Thus, a hydraulic cylinder which could be adjusted to vary the angle of the shear head could function as a "flexible interconnection means" within the purview of the patent claims.

Our conclusion in this regard is compelled by the specific words of Claim 10 that in addition to the chain and the cable which they had previously used as the interconnection means, a hydraulic cylinder might be used. Thus, Claim 10 specifically delineates as a part of the Meece-Dew invention the very thing

(7th Cir. 1943), aff'd 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399 (1944).
Allowing the patentee verbal license only augments the difficulty of understanding the claims. The sanction of new words or hybrids from old ones not only leaves one unsure what a rose is, but also unsure whether a rose is a rose. Thus we find that a claim cannot be interpreted without going beyond the claim itself. No matter how clear a claim appears to be, lurking in the background are documents that may completely disrupt initial views on its meaning.[6]
■ The necessity for a sensible and systematic approach to claim interpretation is axiomatic. The Alice-in-Wonderland view that something means whatever one chooses it to mean makes for enjoyable reading, but bad law. Claims are best construed in connection with

the other parts of the patent instrument and with the circumstances surrounding the inception of the patent application. Doble Engineering Co. v. Leeds & Northrup Co., 134 F.2d 78 (1st Cir. 1943). In utilizing all the patent documents, one should not sacrifice the value of these references by the "unimaginative adherence to well-worn professional phrases." Frankfurter, supra, at 529. Patent law is replete with major canons of construction of minor value which have seldom provided useful guidance in the unraveling of complex claims. Instead, these canons have only added confusion to the problem of claim interpretation. Doble Engineering. Co. v. Leeds & Northrup, supra, at 84.
Autogiro Company of America v. United States, 1967, 384 F.2d 391, 396-397, 181 Ct.Cl. 55 (footnotes omitted).

which White's shear uses. This, of course, is in keeping with the basic concept of the patent as explained by the specifications:

> "Also, whereas a cable has been shown in FIGURES 1-5, a chain in FIGURE 6, and a chain or cable in FIGURES 7 and 8, the basic concept is that of having a means for varying the angle of the plane of the jaw members with respect to the beam. *Consequently, no invention would be involved in replacing flexible cable or chain with an obvious equivalent,[7] such as a hydraulic cylinder . . . ."* (Emphasis added).

This explication of the basic purpose of the invention puts the three little words —"flexible interconnection means"—in perspective. And given this perspective, we hold that the patentee/lexicographer intended to connote the adjustability of the shear head via the "flexible interconnection means".[8]

### The Cylindrical Argument

White makes much ado about the peculiar nature of the hydraulic cylinder. Specifically, he argues that a double acting hydraulic cylinder, because of its capability of rigidity, could not conceivably be the equivalent of a "flexible interconnection means". Thus, the argu-

ment goes, the Meece-Dew patent cannot be construed to "cover a double acting hydraulic cylinder as the sole element of the support linkage".

▮ Contrasting the concepts of "rigidity" and "flexibility", the trial court found this line of reasoning to be persuasive. This is particularly so, according to the Court, where the double acting hydraulic cylinder on the White shear possesses attributes not heretofore proclaimed by Meece and Dew, e. g. the fact that the force of the cylinder can be used to crush brush, snow, or other debris from the base of the tree to order to cut the tree at the lowest possible point. But if the original patentee possessed the novelty of conception, the infringer may not claim non-infringement merely because he put the patented means to a novel use. Beckman Instruments, Inc. v. Chemtronics, Inc., 5 Cir., 1970, 428 F.2d 555, 561; *Walker, supra* at § 563.

The District Court stated the identity of means test of infringement as follows:

> Where a patentee elects to define an element of his claimed combination in terms of a "means" plus a function (as in the Meece claims "flexible interconnection means") it is essential for infringement that the correspond-

---

7. Our disposition on the explicit wording of Claim 10 precludes any foray into the range of protection which might be afforded to *Harrington* under the doctrine of equivalents. 35 U.S.C.A. § 112. In the past, we have held that "an inventor, with respect to his patent, is entitled to a range of equivalents commensurate with the scope of his invention." Up-Right, Inc. v. Safway Products, Inc., 5 Cir., 1963, 315 F.2d 23, 26. See Bryan v. Sid W. Richardson, Inc., 5 Cir., 1958, 254 F.2d 191, 194; Southern Saw Service v. Pittsburgh-Erie Saw Corp., 5 Cir., 1956, 239 F.2d 339; Rosen v. Kahlenberg, 5 Cir., 1973, 474 F.2d 858 (Part II). They could have merely shown the chain and the cable in the drawings and thereafter relied on the courts to interpret what was an equivalent.

8. So often the lexicographic license has been abused. In Thurber Corp. v. Fairchild Motor Corp., *supra,* we gave tribute

to the prolixity of patent solicitors by setting forth in the margin 334 word unpunctuated sentence used in a patent claim. 269 F.2d at 850 n. 7. Later, in Thermo King Corp. v. White's Trucking Service, Inc., *supra,* we lauded the new practice of drafting patent claims in understandable English with punctuational pauses and explanatory indentations. 292 F.2d at 675 n. 9.

Juxtaposed with the claims of our past experience the Meece-Dew application is a model of clarity. It specifically states the claims in terms of means to accomplish ends, i. e. function. In the particular regard with which we are now concerned, it explicitly declares that:

> "Said fixed jaw members being additionally connected to said elongated horizontally disposed beam by flexible interconnection means so that said fixed jaw members are freely moved through a limited pivotal arc." Claim 2(d).

ing means of the accused structure perform the same function in the same way to obtain substantially the same results.

The trial court then found two functions which the interconnection means in the Meece-Dew shear served: [i] to permit free pivotal movement of the shear head, and [ii] to serve to limit the downwardmost position of the arc through which the shear head could move. [(Finding 7)]. In the White shear the pressure of the cylinder against "toter brackets" performed the latter task. Thus, the result was not obtained solely by the hydraulic cylinder. [(Finding 15)].

It was in the former function, however, that the trial Judge found the crucial distinction between the Meece-Dew shear and the accused White shear. The Judge's interpretation of the Meece-Dew shear was that the interconnection means left the shear head "flexible". The White shear was "rigid". Given the antithetical quality of the words "flexible" and "rigid" the trial Judge concluded that there was no infringement as a matter of law. [(Conclusion 29)].

But what was needed was a temporal perspective. Both shear heads were "flexible" at some point in time. Basic to the entire superstructure was the fact that the shear head could be elevated or depressed to attain the proper cutting angle or to maneuver the tractor with the shear assembly. Likewise, both shear heads could be "rigid" when mounted with a hydraulic cylinder and locked into position. The crucial factor for the means was that it could attain the end of "adjustability". This was the crux of the Meece-Dew design.

This functional approach to patent claim construction is a legacy of Hotchkiss v. Greenwood, 1851, 52 U.S. (11 How.) 248, 13 L.Ed. 683; See Graham v. John Deere Co., 1966, 383 U.S. 1, 12, 86 S.Ct. 684, 691, 15 L.Ed.2d 545, 553; Foster Cathead Co. v. Hasha, 5 Cir., 1967, 382 F.2d 761. We recognized the validity of describing elements of a patent in terms of "means" and function in Bryan v. Sid W. Richardson, Inc., 5 Cir., 1958, 254 F.2d 191, 194, where we observed:

The word "means" is no shibboleth. To be sure, it, or its equivalent synonyms, cannot be used to describe the invention at the very point of novelty for to do so would then be to define invention in terms of the result. But where the novelty of the combination . . . is adequately disclosed with definable limitations, other and well-known elements need not be described in structural detail.

We have carefully weighed the arguments of both parties over the meaning of the term "hydraulic cylinder". Harrington contends that the term is a shorthand expression for "double acting hydraulic cylinder". White, on the other hand, points out the fact that a two-way push can be obtained from a double acting hydraulic cylinder, whereas only a one way action results from a single acting cylinder. This fact has obvious incidental benefits, e. g., the shear head can be both raised and lowered by hydraulic power, the force of the cylinder can crush any brush which surrounds the tree, etc. But the crucial property of the Meece-Dew shear was adjustability. And whatever its other benefits, the White double acting hydraulic cylinder accomplishes this function. Regardless of whether the hydraulic cylinder used as an interconnection means acts singly or doubly, it was contemplated by Meece and Dew as an alternative means to the original chain or cable and specifically delineated in Claim 10.

It is also helpful to consider the manner in which the patentees used the term "hydraulic cylinder". It appears not only in Claim 10 with respect to the "flexible interconnection means", but also in Claims 1(c), 2(c), and 5. Claim 5 is illustrative. There the patentees claim a device which employs a hydraulic cylinder to both raise and lower the beam. (See Figure C, supra.) Thus, it is evident that the patentees contemplated by the use of the words "hydraulic

cylinder" a cylinder which could push two ways.

Therefore, whether single or double, the use by White of any hydraulic cylinder which could vary the angle of the cutting head with respect to the plane of the ground constitutes an infringement in derogation of the patent rights of Harrington.

## IV. Can't See The Trees for The Forest

Letter patents serve to foster the constitutional mandate to promote the arts and sciences. If courts undermine the rights of patentees, not by a narrow construction of the scope of the invention, but rather on the basis of semantical facades, then the utility of a patent as a stimulus for greater public disclosure of private inventiveness will be greatly minimized and more inventors will resort to whatever protection the trade secrecy law may afford. *Cf.* United States v. Dubilier Condenser Corp., 1933, 289 U.S. 178, 53 S.Ct. 554, 77 L. Ed. 1114; Sears, Roebuck & Co. v. Stiffel Co., 1964, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661; Compco Corp. v. Day-Brite Lighting, Inc., 1964, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669. The main thesis of our patent system is that public disclosure is a worthy goal.

Meece and Dew designed the first tree shear to employ an angularly adjustable cutting head. This invention presented a significant and patentable improvement over the prior art in that it allowed the tree to be cut parallel to the ground at its lowest point. Not only did this provide more useable wood per tree, but it also reduced the logistical problems of reseeding and—for that band of hardy conservationists now tramping the woods in search of nature, the red-cheeked warbler, see Allison v. Froehlke, 5 Cir., 1972, 470 F.2d 1123, a pure environment, and possible class actions—it enhanced the aesthetic quality of a now-stumpless forest.

By marketing a shear employing this basic concept of the Meece-Dew design without a license from the patent owner,

the defendant White has infringed on the dominant patent of the Plaintiff. Accordingly, this case is reversed and remanded to the District Court for imposition of the appropriate remedies.

Reversed and remanded.