**INGERSOLL–RAND COMPANY, Plaintiff-Appellant-Cross Appellee,**

v.

**BRUNNER & LAY, INC., Defendant-Appellee-Cross Appellant.**

No. 72–2026.

United States Court of Appeals,
Fifth Circuit.

Feb. 20, 1973.

Rehearing and Rehearing En Banc
Denied April 4, 1973.

Richard S. Banick, Miami, Fla., John M. Calimafde, New York City, Carl R. Horten, Princeton, N. J., for plaintiff-appellant.

John H. Oltman, Fort Lauderdale, Edward C. Vandenburgh, Arlington Heights, Fla., for defendant-appellee.

Before GODBOLD, DYER and CLARK, Circuit Judges.

CLARK, Circuit Judge:

Invalidity for obviousness[1] is the broad subject of this patent appeal. A subsidiary issue is joined on the trial court's application of the doctrine of file wrapper estoppel. The imitator who was successful in the court below cross-appealed from the court's refusal to award it attorney's fees.[2] Because we reverse the trial court's determination of obviousness and its invocation of an estoppel against the patentees, the attorneys' fee issue is eliminated; but the case must be remanded for an accounting.

United States Letters Patent No. 3,424,479 issued to J. D. Ditson and James F. Cantrel, the assignors of the plaintiff, Ingersoll-Rand Company, on a coupling and rod system for rock drills. The present action was instituted to enjoin the defendant, Brunner & Lay, Inc., from manufacturing and marketing a drill rod which was alleged to infringe Claims 4 and 5 of the 479 patent.[3] No issue was raised as to the novelty or utility of the device covered by these patent claims.[4] Nor is infringement an issue on this appeal.[5] The complaint sought injunctive relief against continued infringement and an accounting for damages. Brunner & Lay counterclaimed for declaratory judgment of patent invalidity and sought general relief. Brunner & Lay now contends that Ingersoll-Rand's assignors were guilty of fraud in the procurement of the patent and that the trial court abused its discretion in refusing to allow Brunner & Lay to recover attorneys' fees incurred in defense of the litigation.

1. 35 U.S.C.A. § 103:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

2. 35 U.S.C.A. § 285.

3. Disregarding slight semantic differences, the claims are substantially identical. Claim 4 reads:

A drill rod comprising an elongated body including a bore axially therethrough and having a single, spiral, single pitch, attachment thread which is roll formed on said body to extend circumferentially therearound continuously throughout the length of said body, the helix angle of said attachment thread being less than 15 degrees, and a single continuous groove on the crest of said attachment thread continuously throughout its length.

4. 35 U.S.C.A. §§ 101, 102.

5. Brunner & Lay stipulated that at least a portion of its production fell within all the parameters of the claims in issue. The court made no finding on the extent of this infringement because of its conclusion that the patent was invalid.

## Background of the Patent

A percussion drilling rod, as described in the patent claims, is a thick steel tube usually 10 feet in length and $1\frac{1}{2}$ inches in outside diameter, which forms a connection between a hammer on one end and a bit on the other end in an equipment system used to drill holes into rock formations for the purpose of setting dynamite charges. A simple analysis of the physics of the system discloses that rapid hammer blows are struck on the upper end of the drilling rod, which then drives the bit attached to its lower end into the dense material being drilled. As heavier and more efficient hammers and better bits were developed and deeper hole capacity was required, rods were strengthened and were provided with threaded sections at both ends to facilitate attachment to the hammer and bit and to enable interconnection between drill rods. Modern day drill rods not only transmit the enormous force of the rapid heavy hammer blows to the bit, but also serve to carry a stream of air down their bore and through the center of the bit to blow chips and debris back up and out of the hole.

Technology which brought improvements at the hammer and bit ends, made rod breakage due to metal fatigue and wear of threads the most acute equipment problems in this field. When drill rod breaks occurred the equipment operator either had to abandon the broken rod and bit and start a new hole with new equipment, or he had to retrieve the broken section and recondition or replace it. Rods with worn threads similarly had to be reconditioned or replaced. Prior to the marketing of present patented rod, the two principal solutions were to (1) use rods made of relatively low strength steel, which, while subject to breakage, could be reconditioned at the job site by cutting additional threads; or (2) use rods of high strength treated steel which did not break as often, but could only be reconditioned at a machine shop. Although breakage may occur at any point throughout the length of the rod, most breakage failures and wear outs occured within the threaded areas at the ends.

## The Patent in Issue

In May of 1965, J. D. Ditson applied for a patent on a coupling and drill rod system. On January 11, 1966, a continuation-in-part patent application was filed by Ditson and James F. Cantrel with the verified explanation that Cantrel had conceived and reduced a portion of the invention to practice. This joint application eventuated in the grant of the 479 patent to Ditson and Cantrel. The claims in issue here (see footnote 3 above) taught the construction of a drill rod which had a continuous roll-formed thread with a groove in its crest over the entire length of the rod. Illustrative diagrams from the patent grant are appended to this opinion.

Pertinent to the claims involved here, the specifications of the patent provided that among the objects of the invention was to provide a system which would enable the use of high strength rods that could be reconditioned in the field. Other advantages in greater inherent strength and more efficient transmission of energy were said to result from the manner in which the rod and its accompanying coupling member would operate. Specifically, the uniformity of cross-section was described as advantageous in eliminating stress raising factors and possible causes of premature rod failure associated with points of variation in rod cross-section. The process of reconditioning a failed or broken rod was stated to be simplified because it required only the cutting off of the failed or broken portion with a steel saw. This was said to enable the rod manufacturer to initially employ special materials and unusual heat treatment and finishing processes in the fabrication of the rod without consideration of the field reconditioning problems that had previously limited use of such strengthening processes and materials.

*The Standard of Review*

Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), blocks out the equation to guide our detailed fact-law analysis of the trial court's conclusion that claims 4 and 5 of the 479 patent were erroneously allowed upon an obvious device.

While the ultimate question of patent validity is one of law, Great A. & P. Tea Co. v. Supermarket Equipment Corp., supra, 340 U.S. at 155, 71 S.Ct. at 131, the § 103 condition, which is but one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the *obviousness or nonobviousness* of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

Here the controlling facts are undisputed. Our task is to set them into the formula standard and calculate the result.

*The Prior Art*

The art involved is that of metallurgy, in general, and the formation of steel rods for percussion drilling, in particular.

Early in the history of development of percussion drilling systems, practitioners used a rod constructed of twisted steel which could be sharpened on one end to serve the function of a bit. Many of such twisted rods were commonly twisted throughout the length of the rod. The nearest example is U.S. Patent No. 236,774 issued to Butler, et al in 1881. The diagrams accompanying this patent are set out in the appendix. The specifications of the Butler patent taught that the rod could be initially formed by rolling *before being twisted*. It was further provided that the spiral form would aid in freeing the hole of chips, and that the uniformity of rod contour and strength would enable the continued use of any unbroken portion either as a bit end or for insertion into the hammer without forging. Other patents covering or describing twisted drill rods are British Patent No. 26810 to Christiansen and U.S. Patent No. 2,733,943 to Nater. However, no twisted drill rods are shown to have taught any twisting process accurate enough to permit the use of the resulting twists for threading to other drill rod sections and no such twisted rods were shown to now be in use in the particular area of percussion drilling here involved.

Drilling rods with threaded sections at each end to accommodate coupling to hammer, bit, and each other were previously patented. An early example is Patent No. Re. 17,557 to Thurston which shows end threading of a sinuous or undulatory contour, designed for use with a straight coupling so as to seat each rod end snugly against its opposite piece. This thread and coupling configuration is similar to that illustrated by Ditson and Cantrel but was specified to extend only for the length of the coupling or a thread width beyond. Nevertheless, both Thurston and the No. 1,952,996 U.S. Patent to Landgraf illustrated threads which extended beyond the length of the coupling. Karlsson had also obtained U.S. Patent No. 3,211,484, which taught the utility of a rod with two separate sections of threads interrupted by an unthreaded interval of the same diameter as the adjacent rod. The diagrams accompanying Karlsson are appended.

The technique of roll-forming threads on regular piping and the technique of applying an external thread throughout the length of a piece of such piping had

also been patented to Finch (U.S. No. 2,669,469) and Boyer (No. 1,904,675), respectively. Boyer's diagram is appended. His patent also emphasized the advantage of easy reconditioning at remote sites by the use of only a saw to square off ends of the lengths to be fitted together.

It was known in the art of roll-forming threads that as the dies of the forming machine were pressed into the material on which the threads were to be formed, metal was pushed (plastically deformed) from the valley of the thread toward the peak during the process. On some materials this displaced metal was known to move from the valley toward each adjacent peak in 'waves, which could be left at each side of the peak to form a groove—by interrupting the rolling process, or could be pushed on to close and fold inward at the peak— thereby leaving only a barely visible or microscopic seam at the peak upon completion of rolling.

The provision for lubrication of the coupled joint by means of a groove on the thread surface had previously been patented to Rochrenwerke A. G. by Italian Patent No. S13,952. Heat treating and a finishing technique known as carburizing, which greatly strengthen streel rods, were well known to the prior art and both procedures had been widely applied to drill rod manufacture.

Expressed in terms of the claims here involved, each of the following elements or processes in drill road manufacture had been disclosed by patents or in practice: (1) an elongated body, with (2) a full length axial bore; (3) a roll-formed helical attachment thread, with (4) a helix angle of less than 15 degrees; and (5) a groove on the thread to carry lubricant.

### The Presumption of Patent Validity

One otherwise an infringer who assails the validity of a regularly issued patent bears a heavy burden of persuasion. We have variously recognized this burden to be akin to the fraud standard of clear and convincing evidence and to the criminal law standard of proof beyond a reasonable doubt, but, at a minimum, greater than a mere preponderance of the evidence. Hobbs v. United States Atomic Energy Commission, 451 F.2d 849 (5th Cir. 1971); Stamicarbon, N. V. v. Escambia Chemical Corp., 430 F.2d 920 (5th Cir.), cert. denied 400 U. S. 944, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970).

This presumption of patent validity is weakened and may be overcome where the evidence discloses that the examiner did not have the best prior art before him during the prosecution of the application. Beckman Instruments, Inc. v. Chemtronics, Inc., 439 F.2d 1369 (5th Cir.), cert. denied 400 U.S. 956, 91 S.Ct. 354, 27 L.Ed.2d 264 (1970). However, where, as here, it is shown that the patent office considered prior art as close to the patented invention as any suggested to the court, the court should be extremely reluctant to substitute its opinion for the expertise of the patent office. Hobbs, supra, 451 F.2d at 863.

### The Nonobviousness of the Differences

Uniquely, the drilling rod disclosed by the 479 patent was to be continuously threaded from end to end and its geometry was required to be uniform. In addition, an incomplete roll-forming process was to be used to form the continuous thread on the rod in which the thread was to be formed, so as to leave a gap or groove at its peak rather than the usual closed seam produced when this process of thread formation is carried to completion. Such combination uniformity of cross-section and unusual thread formation produced the synergistic result which must obtain when combinations of known elements are brought together in a new nonobvious combination. Anderson's Black Rock, Inc. v. Pavement Salvage Co., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969). Ag Pro, Inc. v. Sakraida, 474 F.2d 167 (5th Cir. 1973).

This novel configuration not only enabled the rod manufacturer to strengthen the rod by post-manufacturing treatment at his plant without precluding easy field reconditioning, it also increased the rod's resistance to fatigue failure by eliminating any point of change in cross-section dimension at which the unique stresses of percussion drilling could concentrate to crack and destroy the rod.

■ Despite the fact that most of the principal elements of the 479 rod were well known in the prior art, to combine them and add the novelty of full length threading, as did Ditson and Cantrel, required that a person ordinarily skilled in the prior art must ignore that most rod failures occurred in the threaded sections and that the design of a rod with threads throughout its length would probably aggravate rather than lessen its tendency to fail in heavy use. Such a known disadvantage in old devices that would naturally discourage the search for a new invention in this direction, is a reliable indicator of nonobviousness. United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966).

■ While the art of roll-forming threads contained the knowledge that this process could be stopped at an early stage of completion and that the result would be to leave a gap or groove at the crest of the threads, it also taught that normal use of his thread-forming process called for it to be carried further to the point which left only a barely visible, or invisible seam or crevice. The trial court held that the patent examiner was *apparently* not aware that this was a necessary result of the roll-threading technique. Such an attribution of lack of expertise to patent office examiners without support in the record is error. Hobbs v. United States Atomic Energy Commission, *supra*, 451 F.2d at 863. In any event, the strengthening effect of the inventors' choice to require that the roll formation be stopped short, leaving a visible gap or groove at the thread crest for this application, was the essence of the invention here. There is no showing whatsoever that this technique of applying the roll-forming art to produce the strength desired should have been obvious to one of ordinary skill.

The district court also concluded that the threading of a drill rod for its full length merely carried the prior art concept of creating one or two sets of threads at each end of a rod to the next obvious stage. The problem for this conclusion is that no proof was adduced that this had ever been done, attempted or suggested. *Cf.* Laitram Corp. v. Deepsouth Packing Co., 443 F.2d 928, 934 (5th Cir. 1971). On the other hand, the proof of frequent failure in the threaded portions of the rods clearly negates the court's unsupported conclusion.

All of the secondary considerations similarly tend to establish nonobviousness. The acceptance of the fully threaded rod was rapid and widespread. Assuming that imitation is the sincerest form of flattery converts Brunner & Lay's president to Ingersoll-Rand's best witness, for he conceded that promptly upon learning of the widespread use and acceptance of Ingersoll-Rand's rod he attempted to copy it. His first attempt at imitation was unsuccessful because he bought equipment which cut rather than rolling the thread form. However, when he finally perfected his infringement, he then reproduced Ingersoll-Rand's advertising copy almost verbatim to extol the virtues of his new product. The record is uncontradicted that commercial success was the immediate consequence of the marketing of this device. Similarly the record demonstrates that there was both a need for this type rod and a failure of others to develop it. These factors reenforce the conclusion of nonobviousness. Hobbs v. United States Atomic Energy Commission, *supra* 451 F.2d at 864.

*File Wrapper Estoppel*

■ In the course of the prosecution of this patent application, the patent ex-

aminer on more than one occasion disallowed claims reading on drill rods which were roll-threaded throughout the length of the rod. Ditson and Cantrel took no appeal from this decision but rather, continued to modify their rod claims until the examiner finally allowed the present Claims 4 and 5, which provided not only for the fully roll-threaded rod but for the thread to be so formed as to have a continuous groove along its crest. The court held the plaintiff, as assignee, estopped to contend that the formation of a thread on a drill rod throughout its length, which was formed by the roll threading process, was a patentable, nonobvious advance in the art. This deduction of estoppel was erroneous.

It is, of course, well-settled that an invention is to be construed not only in light of the claims but also with reference to the file wrapper or prosecution history in the patent office. Graham v. John Deere Co. of Kansas City, *supra*, 383 U.S. at 33, 86 S.Ct. at 702. An estoppel may arise from the applicant's conduct during the prosecution of his patent application. The essence of this doctrine of file wrapper estoppel is that an applicant who has limited or modified a claim in order to avoid its rejection by the patent office may not thereafter expand the claim by including subject matter thus excluded or any equivalent thereof, or by omitting limitations he has thus been caused to add. 60 Am.Jur.2d 534, Patents § 384.

Normally file wrapper estoppel is invoked when the holder of a valid patent claims infringement by a device which reads only upon the claim as disallowed. That is not the case here. The purpose of amendments required by the patent office is to limit and define the scope of the invention in the light of the prior art cited by the patent office against it. When the amendatory language is accepted by the patent office and a patent is issued thereon, the language of the specification and claims, as thus modified, approved by the patent office, defines the invention and constitutes the grant. Williams Bit and Tool Co. v. Christensen Diamond Products Co., 399 F.2d 628 (5th Cir. 1968).

In sum, a patentee who is estopped from attempting to enlarge the scope of his monopoly by asserting infringement by a competitor's product which is only covered by the rejected patent claim, is not precluded from contending that the patent claim before amendment was erroneously rejected by the patent office *for the purpose of showing that his patent as issued is nonobvious*. The action of a patent applicant in voluntarily narrowing his claim to conform to the opinion of the patent examiner furnishes no basis in fact or reason for inferring that he has admitted the invalidity of the patent as issued, in whole or in part. International Cellucotton Products Co. v. Sterilek Co., 94 F.2d 10 (2nd Cir. 1938).

### Invention by Cantrel

The finding by the district court that Cantrel contributed nothing to the device described in Claims 4 and 5 is clearly erroneous. Not only does the presumption of patent validity carry the initial burden of establishing his standing as a co-inventor, but also an examination of the file wrapper and the deposition and testimonial evidence discloses his participation in the creation of the patented device. No contrary evidence appears in the record.

### Conclusion

The judgment of the district court is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

THE PATENT IN ISSUE

Jan. 28, 1969          J. D. DITSON ET AL.          3,424,479

COUPLING AND ROD SYSTEM
FOR ROCK DRILLS

Filed Jan. 11, 1966                          Sheet 1 of 2

FIG. 1

FIG. 2

FIG. 3

| KEY | |
|---|---|
| 10. | Hole |
| 13. | Drill rod body |
| 16. | Coupling |
| 18. | Bit |
| 24. | Continuous thread |
| 26. | Groove on thread crest |

INVENTORS
J. D. DITSON
JAMES F. CANTREL

500

A. L. BUTLER & M. C. BULLOCK
Striking Drill for
Mining Purposes.

No. 236,774

Patented Jan. 18, 1881

Fig.1

Fig.2.        Fig 3.

E. S. BOYER
Pipe

No. 1,904,675
April 18, 1933

Filed April 13, 1931

B.H.A. KARLSSON ET AL
Extension Rod for
Drill Rods

No. 3,211,484
Oct. 12, 1965

Filed Oct. 30, 1963.

Fig.1.

Fig.1