Preston G. GADDIS, Plaintiff-Appellee,

v.

CALGON CORPORATION,
Defendant-Appellant.

No. 73–3663.

United States Court of Appeals,
Fifth Circuit.

Jan. 15, 1975.

Joseph M. Fitzpatrick, New York City, Stanley E. Neely, Larry M. Lesh, Dallas, Tex., Eugene F. Buell, Pittsburgh, Pa., for defendant-appellant.

V. Bryan Medlock, Jr., Dallas, Tex., for plaintiff-appellee.

Before BROWN, Chief Judge, and AINSWORTH and DYER, Circuit Judges.

AINSWORTH, Circuit Judge:

Plaintiff, Preston G. Gaddis, brought this suit for the infringement by Calgon Corporation of United States Patent No. 3,425,669 [Patent '669] issued to plaintiff on February 4, 1969, for a "Dry Chemical Feeder Method and Apparatus." Defendant answered and generally denied plaintiff's allegations; it stated that the patent in suit was invalid and void, and further that its practices did not infringe any valid claims of the patent. Defendant also counterclaimed for damages under the antitrust laws of the United States, 15 U.S.C. §§ 1, 2 and 3, and averred that plaintiff had misused the patent in suit by utilizing it to control the sale of unpatented or unpatentable materials to the damage of defendant. The district court submitted 15 special interrogatories to the jury, which found the patent valid, that Claims 1 and 10 thereof were willfully and wantonly infringed by Calgon by its manufacture, use and sale of its own feeder devices, and that Gaddis had not misused the patent in suit.[1]

1. The Gaddis patent claims

Claims 1 and 10, the only claims pertinent to this controversy, read as follows:

Claim 1

An apparatus for dispensing and mixing a dry chemical with a liquid and comprising a mixing chamber, a chemical storage reservoir, feeder means interposed between the chemical storage reservoir and mixing chamber, a wetting plane provided in the mixing chamber, said feeder means adapted for separating the chemical into individual particles and dispensing the individual particles onto the wetting plane, means for introducing a liquid into the mixing chamber in a rolling swirling action, and said wetting plane discharging the wetted individual particles therefrom into the swirling liquid for a thorough mixing of the chemicals therewith to provide a liquid solution.

Claim 10

A method for feeding and mixing a dry chemical with a liquid which comprises introducing the liquid into a mixing chamber, providing a swirling action for the liquid in the chamber during the mixing operation, provid-

The trial court entered judgment in accordance with the jury's answers to special interrogatories and further found because of Calgon's willful and wanton infringement that the case was an exceptional one within the meaning of 35 U.S.C. § 285, justifying the award of reasonable attorneys' fees to Gaddis.[2] A motion for judgment notwithstanding the verdict filed by Calgon was overruled by order of the trial court in which it stated that there was substantial evidence to support the jury's verdict and that

"The only issue remaining is the question of obviousness under 35 U.S.C. § 103. This issue is a question of law, although it is determined on the basis of certain factual inquiries which were submitted for determination by the jury. Graham v. John Deere Co., 383 U.S. 1, 17–18 [86 S.Ct. 684, 15 L.Ed.2d 545] (1965).

"Section 103 of the Patent Act of 1952 provides that a patent may not be obtained if the subject matter would have been obvious to a person with ordinary skill in that art. In response to Special Issue No. 9, the jury found that the differences between the Gaddis invention and the prior art, were *not* differences within the ordinary skill of the art. From this factual determination, this court concludes as a matter of law that the differences between the Gaddis invention and the prior art would not have been obvious to a person reasonably skilled in that art, and that Patent '669 is valid under 35 U.S.C. § 103."

Calgon appeals from the judgment of validity and infringement, from the finding of willful and wanton infringement, and the award of attorneys' fees. We affirm the judgment of validity and infringement, but reverse in respect to willful and wanton infringement and the award of attorneys' fees.

The Gaddis Petroleum Corporation is an oil-producing corporation which, through its Gaco Manufacturing Division, manufactures feeding equipment for the purpose of introducing chemicals into oil. Plaintiff, Preston Gaddis, is a stockholder in the corporation. Calgon is engaged in the manufacture and sale of water-treatment equipment, including filtration devices, pumps and miscellaneous chemical feeders. In 1965, after having experimented with various feeders, Gaddis became satisfied that the principle of pre-wetting individual particles of polymers by dropping them onto a wetting plane, prior to agitating them in a tank, would successfully dissolve these chemicals. In 1966 Calgon's representative, Ben Sloat, approached Gaddis and asked him when he would be able to provide them with a feeder that would do this particular job. In June 1967, Gaddis started producing his DSF–100, the first of what he described as a full-fledged feeder, a prototype of the Dry Chemical '669 feeder, the patent in suit. The device was shown to Sloat who responded enthusiastically.[3] Calgon,

ing a wetting plane within the mixing chamber above the swirling liquid, providing a supply of the chemical independent of the mixing chamber, separating the chemical into individual particles, dropping the individual particles by gravity onto the wetting plane for an initial wetting of the particles and moving the initially wetted particles along the wetting plane for discharge into the swirling liquid for a thorough mixing of the chemicals with the liquid.

2. The appointment of a special master and the conducting of an accounting was stayed by the trial court pending this appeal.

3. Ben Sloat wrote the following letter to the Calgon Denver Office:

"Gentlemen:

"About three months ago I sent out a request letter for everybody to start zeroing in on this polymer feeding proposition. Results have been very encouraging. Word from the Illinois Basin along with experience by Joe Kirk in Oklahoma and by Steve Adkins and Dwayne Edwards in Wichita have all been blended into an experience pattern. I had a chance to look at the most recent set up put together by John Taylor for feeding several hundred pounds a day of polymer in North Texas. Even though all of us have contributed quite a bit to this polymer feeding I think that the attached picture will be convincing evidence that Mr. Preston Gaddis of the Gaco

through an agreement with Gaddis, began using the DSF–100 in the summer of 1967. On November 13, 1967, Gaddis filed his application for the '669 invention. On February 4, 1969, United States Patent No. 3,425,669 issued to Gaddis. During the same month Calgon introduced and offered for sale a line of feeders of its own manufacture similar in construction and performance to the Gaddis No. '669 feeder. In March, or the early spring of 1969 Gaddis discovered that Calgon was infringing his '669 invention and brought it to the attention of Calgon. Calgon representatives promptly met with Gaddis and informed him that it was their belief that the invention was invalid and denied infringement of the claims of Gaddis' patent. Following the meeting with Gaddis, Cal-

Manufacturing Division in Bartlesville has done more than all the rest of us put together. Mr. Gaddis brought to bear a rare combination of talent, mechanical engineering ability and oil producing experience, along with a good background as a chemical feed pump manufacturer and came up with the Model DSF–100.

"Mr. Gaddis tried five different polymer mixing principles, with three test units never passing shop tryouts. One test rig made it to the field and with minor modifications will make a good D–18 Coagulant feeder.

"The DSF–100 wets each polymer particle before it enters the solution chamber. Once in the solution chamber each polymer particle has at least three minutes (average 4½ minutes at 150 pound per day feed rate) to completely dissolve. The DSF–100 can easily be cylced [sic] five times an hour (10 times an hour maximum) and feed one pound of polymer in each cycle of fresh water. With brine as the make-up, two pounds of polymer a cycle will be possible. The range of the DSF–100 is tremendous. For example—it could cycle one time a day with 0.1 pounds of dry solids per cycle. It could cycle 240 times a day with 2 pounds of dry solids a cycle—or anywhere in between these two extremes.

"Proportioning the feed solution into the system can be handled in any of three ways depending on the pressure, volume and accuracy needed. When accuracy is important and the feed solution can be concentrated up to 15 pounds a cycle (S–12, S–21, X–13, X–9, etc.) a duplex chemical feed pump should be specified. Chemical feed pump options range from duplex units that will cycle the DSF–100 one time a day against better than 1100 psi to chemical pumps that will cycle the DSF–100 twice an hour against 200 psi. In general, this chemical feed pump option will be used up to 50 pounds a day of polymer, or when the feeder is ultimately to be used where chemical pump accuracy will be important.

"For a volume feed rate (greater than 2 cycles an hour) at discharge pressures under 20 psi a small gear pump is the most practical. The gear pump presently on the unit in the picture will cycle the unit 8 times an hour. By use of a by-pass the cycle frequency could be cut down to 2 times an hour quite easily.

"For high volume, high pressure feeding situations (greater than 2 cycles an hour against up to 2,000 psi) a standard plunger pump should be used. Gaco has pumps available which will cycle the feeder from 2 times an hour to 10 times an hour against any pressure up to 2,000 pounds.

"List price for the DSF–100 alone is $1185. Add on $500 for the duplex chemical feed pump option. Add $350 for the gear pump option. Both of these options come as a single unit integrated with the complete automation system of the DSF–100. ◂The separate plunger pump option is a $750 add on figure and will come as a separate skid mounted unit.

"The standard DSF–100 requires 50 psi inlet water pressure and 110 volts of power. If 50 psi water pressure is not available, then an add-on of $250 will permit modifying the DSF–100 so that an additional pump will pressure water from 0 to the required 50 psi. Water going into the DSF–100 should be filtered and in the event that filtered and pressured water is not available another $100 add-on will provide for an eight element cartridge filter to take care of this matter.

"What all of this boils down to is that we can now feed polymer in a completely corrosion resistant fashion in any amount and against any discharge pressure for a figure of less than $2000. You are all aware of the tremendous emphasis being placed on polymer sales for the coming years. Those of us who have been working with polymer projects for the last four or five months have realized that our sales will only be as good as our feeding abilities. I think the DSF–100 will bring us along very nicely.

"A spec sheet covering the DSF–100 is now under preparation and will be available within the next few weeks. Please direct requests for this specification sheet to me in Denver.

"Thank you.

/s/ Ben Sloat
Ben Sloat"

gon sought the opinion of Eugene F. Buell, a patent specialist lawyer in Pittsburgh, who made a search of the prior art patents relative to the Gaddis patent and reported to Calgon on July 30, 1969 that it was his opinion that the Gaddis patent was not inventive and there was nothing patentable in the Gaddis broad claims inasmuch as the subject matter was fully disclosed by prior art, particularly the patents of Jamison, Watson, and Harvey, the latter two not having been cited by the Patent Office Examiner. Based on this advice, Calgon continued to manufacture and sell its feeders. Gaddis filed the present action for infringement on October 6, 1969. On November 7, 1969, Calgon employed a Washington, D. C. patent firm to make another search and validity study, resulting in a second opinion that the Gaddis patent was invalid.

## I. VALIDITY OF THE GADDIS PATENT

■ In order to be patentable, a device must not only be useful and novel, it must also be non-obvious in light of the prior art. Graham v. John Deere Company of Kansas City, 383 U.S. 1, 3, 86 S.Ct. 684, 686, 15 L.Ed.2d 545 (1966); Rosen v. Kahlenberg, 5 Cir., 1973, 474 F.2d 858, 867; Ramirez v. Perez, 5 Cir., 1972, 457 F.2d 267, 269; Beckman Instruments, Inc. v. Chemtronics, Inc., 5 Cir., 1970, 428 F.2d 555, 561; Swofford v. B & W, Inc., 5 Cir., 1968, 395 F.2d 362, 364. Calgon contends that the district judge erroneously considered the factual determination by the jury—that the differences between the Gaddis patent and the prior art were not differences within the ordinary skill of the art—as the basis for his holding of non-obviousness.

While the ultimate question of obviousness is one of law, Graham v. John Deere Company of Kansas City, supra; Garrett Corporation v. American Safety Flight Systems, Inc., 5 Cir., 1974, 502 F.2d 9, this issue nevertheless lends itself to the following basic factual inquiries: (1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue, and (3) the level of ordinary skill in the art. Graham v. John Deere Company of Kansas City, supra, 383 U.S. at 17, 86 S.Ct. at 694. The trial judge thoroughly instructed the jury in respect to Calgon's burden of proving obviousness under the requirements demanded by Graham, supra. The jury found, in response to interrogatories incorporating those requirements, that Calgon had failed in its proof. Thereafter, in denying Calgon's motion for judgment notwithstanding the verdict, the trial judge independently concluded as a matter of law, based on the factual determinations made by the jury, that the prior art would not have been obvious to a person reasonably skilled in the art. In determining non-obviousness, the trial judge specifically cited Graham, supra, as a basis for his conclusion. We have independently analyzed the testimony and the numerous graphic illustrations and exhibits introduced in evidence and are unable to agree with Calgon that the district court failed to apply the correct legal standards for determining non-obviousness.[4]

The Patent Examiner cited patents issued to Jamison, Gart, Martin and Katzer. Calgon contends that certain prior art—the Syntron, Watson and Harvey devices, which were not considered by the Patent Office—is much more pertinent than the cited patents and discloses

---

4. There is no dispute from the evidence that the Gaddis invention has enjoyed considerable commercial success. There is also evidence that the Gaddis DSF–100 feeder, which was the forerunner and prototype of the '669 patent in suit, was considered by Calgon to be a breakthrough in the oil industry's need for an inexpensive feeder designed for the quick, efficient and thorough mixing of polymers with liquid. Such secondary considerations, i. e.,

commercial success by the patentee and failure of others to supply long-felt needs of the industry, although not essential for determining the question of obviousness, are relevant for such a determination. See Graham v. John Deere Company of Kansas City, 383 U.S. 1, 17, 18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966); Ingersoll-Rand Company v. Brunner & Lay, Inc., 5 Cir., 1973, 474 F.2d 491, 495.

the same combination of elements and performance of function as the patent in suit, thereby invalidating the Gaddis patent.

 A patent of course is presumed valid and the burden of establishing invalidity rests upon the party asserting it. 35 U.S.C. § 282. However, pertinent prior art not considered by the Patent Office weakens the presumption of validity which normally attaches to a patent and requires a court to scrutinize the patent more closely. Beckman Instruments, Inc. v. Chemtronics, Inc., 5 Cir., 1970, 428 F.2d 555, 557; Ingersoll-Rand Company v. Brunner & Lay, Inc., 5 Cir., 1973, 474 F.2d 491, 496; Cornell v. Adams Engineering Company, 5 Cir., 1958, 258 F.2d 874. Nevertheless, the presumption of validity is a strong one and is not to be overthrown except by clear and cogent evidence, that is, "evidence [which] has more than a dubious preponderance." Radio Corporation v. Radio Engineering Laboratories, 293 U.S. 1, 8, 55 S.Ct. 928, 931, 79 L.Ed. 163. Thus, the pertinent question here is whether Calgon has met its burden by demonstrating that the teachings of the prior art relied on by it clearly destroy the presumption of validity.

*The Gaddis patent.*

The inventiveness of the Gaddis device is the economical, efficient and quick method and means of feeding and mixing free-flowing agglomerative dry chemicals with water, in a manner which provides for pre-wetting of the difficult-to-dissolve polymers before agitation, thereby precluding massing or globbing of the individual particles during the mixing process. The device itself consists of a storage reservoir from which the chemicals drop by gravity onto a horizontal vibrating trough which spreads and separates the particles causing them to bounce off onto a wetting plane, a gently moving, fan-shaped sheet of water provided by a spray nozzle in the upper part of a mixing chamber. The wetting plane individually pre-wets the particles and then discharges them into swirling water introduced by a small nozzle in the lower part of the mixing chamber, creating a hydraulic action for a thorough mixing of the chemicals with the liquid.

*The prior art.*

*The Syntron device.*

This apparatus contains combinations of elements similar to those found in the Gaddis invention, including a storage hopper, a vibratory feeder (which admittedly was used by Syntron prior to the Gaddis invention) located under the hopper, and a pre-wetting chamber. Dry material is fed from the hopper onto the vibrating feeder and thence into a solution pot where the material is pre-wet prior to its flowing into a mixing tank. Unlike Gaddis, the pre-wetting is accomplished by a thin film-like flow of liquid swirling around a conical solution pot, forcing the mixture downward into the throat of the vortex and thence into a mixing chamber. The significant difference between the Syntron and Gaddis devices rests in function and effect of the conical pre-wetting process of Syntron's device and the fan-shaped pre-wetting plane of the Gaddis claims. Testimony by one of Calgon's experts established that it is conceivable that some of the particles of polymers flowing through the throat of a vortex similar to that used by Syntron may not become wet, thus producing lumps.

*The Watson patent.*

The Watson device consists of a funnel-shaped container into which chemicals are placed and then discharged into a cylindrical tank in which angled slots are arranged to allow water passing through them into a conduit to form baffles or layers which intersect, thus producing several areas of high turbulence within the conduit. The mixture is then conducted to a container where it goes into solution under the influence of mild agitation. The Watson patent, unlike that of Gaddis, does not teach that the chemicals should be separated into individual particles and gently pre-wet to

avoid clumping. Instead the chemicals flowing through the narrow mouth of the channel have a tendency to concentrate as they fall into the conduit, and the wetting process is produced by high turbulence.

*The Harvey patent.*

The Harvey apparatus shows a funnel-shaped hopper, similar to that of the Watson device, which introduces chemicals into a mixing tube. The mixing tube contains apertures which are preferably slanted downwardly in order to give increased velocity to liquid entering the tube through the apertures. Unlike the Gaddis patent, it contains no teaching of separation of individual particles and no wetting plane to receive these particles. Similar to Watson, the wetting process is violent, not gentle as in the Gaddis device.

■ Our comparison of the prior art relied on by Calgon with the Gaddis patent claims convinces us, as it did the jury and the district judge, that Calgon has failed in its burden to destroy the presumption of validity of the Gaddis patent.

## II. THE ISSUE OF INFRINGEMENT

■ The question of infringement of a patent is a question of fact. United States v. Esnault-Pelterie, 299 U.S. 201, 205, 57 S.Ct. 159, 161, 81 L.Ed. 123; Ziegler v. Phillips Petroleum Company, 5 Cir., 1973, 483 F.2d 858, 867; Harrington Manufacturing Co., Inc. v. White, 5 Cir., 1973, 475 F.2d 788, 796; Reynolds-Southwestern Corp. v. Dresser Industries, Inc., 5 Cir., 1967, 372 F.2d 592, 595. Infringement occurs only if there is substantial identity between the accused device and the patented invention as to means, operation and result. Harrington Manufacturing Co., Inc. v. White, supra; Beckman Instruments, Inc. v. Chemtronics, Inc., 5 Cir., 1970, 428 F.2d 555, 563; McCutchen v. Singer Company, 5 Cir., 1967, 386 F.2d 82, 89.

Calgon's principal contention in its argument against infringement is that the Gaddis claims, specifications and drawings require that means be provided for the introduction of water into the mixing tank, and that Calgon has no separate means or method for that function. The omission of that element, according to Calgon, avoids infringement. An examination of the record, including the testimony of plaintiff's and defendant's experts, shows that there is no substantial or significant difference between the two devices despite the fact that Calgon's device, unlike that of Gaddis, uses only one source of water supply, and the turbulence required for mixing the polymers is produced mechanically instead of hydraulically.

Albert F. Yost, an employee of Calgon, who testified as its expert, described what Calgon contends is the typical Calgon feeder, the CPF model, as an apparatus for dispensing and mixing dry chemicals. It consists of a storage hopper, with a vibratory trough located between the hopper and a mixing tank. A water weir, which produces a sheet of water, is positioned beneath the trough. The polymer moves down from the hopper onto the trough from which it is bounced off as individual particles onto the moving sheet of water. A mechanical mixer, attached to the side of the tank, mixes the polymers with water which has reached the tank through the water weir beneath the trough. The testimony of Israel W. Santry, expert witness for Gaddis, essentially corroborated that of Yost in his description of the Calgon feeders. He further stated, however, that the mechanical mixing employed by Calgon accomplishes substantially the same result as that of the Gaddis hydraulic mixing.

■ We recognize the well-established rule that an omission in the accused device of an ingredient or element contained in the complainant's patent avoids infringement. Dunbar v. Meyers, 94 U.S. 187, 201, 24 L.Ed. 34 (1876); Cimiotti Unhairing Company v. American Fur Refining Company, 198 U.S. 399, 410, 25 S.Ct. 697, 702, 49 L.Ed 1100 (1905).

Nevertheless, Gaddis can still prevail under the doctrine of equivalents if his and Calgon's devices do the same work in substantially the same way and accomplish the same result. Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929); Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950); Rosen v. Kahlenberg, 5 Cir., 1973, 474 F.2d 858, 867. The theory on which the doctrine of equivalents is founded is that "if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape." Graver Tank & Mfg. Co., supra, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097, quoting from Union Paper Bag Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935, 938 (1878); Rosen v. Kahlenberg, 5 Cir., 1973, 474 F.2d 858, 867.

We find no error in the finding of infringement reached by the jury.

### III. THE ISSUE OF WILLFUL AND WANTON INFRINGEMENT AND THE AWARD OF ATTORNEYS' FEES

We find no substantial evidence to support the finding that infringement was willful and wanton. The patent was issued February 4, 1969. The record does not indicate that Calgon was aware of the patent until Gaddis called this fact to its attention in the spring of 1969.[5] Gaddis was thereafter promptly informed that it was the opinion of Calgon's staff that the Gaddis patent was not valid and therefore not infringed. Calgon's reliance on non-validity was buttressed by the opinion obtained from its independent Pittsburgh patent counsel on July 30, 1969. It was only after this sequence of events that Gaddis filed suit on October 6, 1969. Under these circumstances, Gaddis' contention that Calgon could not hide behind after-obtained legal opinions expressing invalidity of the Gaddis patent, allegedly sought to justify Calgon's prior infringement, must fall.[6] There is no suggestion in the record to indicate that the Pittsburgh patent law firm opinion was not a bona fide one, or that Calgon did not act in good faith in requesting it. Calgon's belief that the patent was invalid, based on that opinion, militates against willful and wanton infringement. See Duo-Flex Corporation v. Building Service Company, 5 Cir., 1963, 322 F.2d 94, 100. Thus we cannot uphold the finding of willful and wanton infringement. Consequently, the award of attorneys' fees based on that unwarranted finding likewise is reversed.

Affirmed in part; reversed in part.

---

**5.** In Gaddis' brief reference is made to documents outside the record tending to show Calgon's knowledge. We obviously cannot take note of evidence not of record.

**6.** Cf. General Electric Company v. Sciaky Bros., Inc., 6 Cir., 1969, 415 F.2d 1068, in which an opinion from outside counsel was not obtained until eight years after General Electric "had commenced its willful and deliberate infringement." *Id.,* at 1072, 1073.